# Exhibit D

### AIRCRAFT DRY LEASE AGREEMENT

This Aircraft DRY Lease Agreement, including the attachments hereto (the Agreement), is entered into as of the 25 day of March, 2015 by and between PASS Charters., a Michigan corporation (PASS Charters), as dry lessee, and Via Airlines, a Colorado corporation (ViaAir), as wet lessor.

### RECITALS

PASS Charters, engaged in the sales of passenger air transportation services.

ViaAir, an air carrier of the United States, holds Air Carrier Operating Certificate Number GN0A005I issued by the Federal Aviation Administration (FAA), DOT Commuter Authority issued by DOT Order 2011-4-11, and an approved air taxi registration under Part 298 of the DOT regulations. ViaAir is authorized to engage in domestic and international operations in common carriage under Federal Aviation Regulations (FAR) Part 135 and in the process of securing authorization under Part 121, including between the United States and islands/nations in the Caribbean Sea, and engages in such operations on a continuous basis.

Pursuant to and in compliance with paragraphs (a) through (d) of FAR 119.53, 14 CFR § 119.53, ViaAir, as dry lessor, and PASS Charters, as dry lessee, hereby contract for the operation by ViaAir of flights for the transportation of PASS Charters's customers via on demand charter flights using one or more aircraft from ViaAir's existing fleet on the terms and conditions set forth in this Agreement.

Pass shall be the exclusive collegiate partner with ViaAir on all capacity within the ViaAir fleet (for both the dedicated and non dedicated Pass Charters Airplanes) contingent upon Pass Charters utilizing all of the Aircrafts detailed in Attachment D and in full compliance with all terms detailed in this agreement.

ViaAir shall, at all times, have exclusive operational control of all aircraft utilized for operations pursuant to this Agreement. Such aircraft shall be utilized exclusively for the carriage of PASS Charters's traffic in accordance with schedules developed by PASS Charters, provided such schedules may lawfully be operated by ViaAir.

In consideration of the mutual covenants contained herein, PASS Charters and ViaAir agree as follows:

### TERMS AND CONDITIONS

GENERAL COMMERCIAL TERMS:

a. Aircraft types and N-numbers to be operated by ViaAir: as detailed in Attachment D or equivalent aircraft. ViaAir will make best efforts to provide aircraft in its fleet type which has the highest weight carrying capabilities

b. Passenger seats per aircraft: 30 seat while operated under FAR part 135. Full aircraft capacity while operated under FAR part 121 expected to be completed by December 1st 2015. In the event that there is a delay in the 121 certification and Pass is being panelized by its clients or has to secure alternate lift, the parties will discuss a mechanism in which Via will provide some compensation to PASS to offset the PASS penalty

c. Operational base: base as agreed upon mutually by the parties.

d. Term: Starting on April 2nd 2015 with Aircraft start dates as detailed in Attachment D through November 1st, 2017.; thereafter, term shall renew automatically in one (1) year increments unless either party delivers written notice of nonrenewal at least 90 days in advance of renewal date, or as otherwise agreed by the parties. PASS Charters shall have the sole right to terminate this agreement with notice to the ViaAir under the following conditions: 1) ViaAir has its FAA Air Carrier Certificate revoked or suspended. 2) ViaAir breaches the Exclusivity clause.

e. Price Payable to ViaAir: Fixed Monthly Amount as detailed in Attachment D for each Aircraft in service each month payable on or before the the 28th of the preceding month to cover the fixed costs of the aircraft. In addition PASS Charters shall pay hourly rate per block hour in any annual term of this agreement, as detailed

in Attachment C; PASS Charters will collect from passengers and remit to cognizant authorities all applicable taxes and government fees.

f. NO MINIMUM MONTHLY HOUR GUARANTEE.

g. Security Deposit: an amount equal to the monthly fixed payment for each plane (USD $126,291.00 for each ERJ140 and USD $85,416 for each EMB120) to be paid within 22 days of signing this Agreement (Security Deposit for the EMB-120 shall be paid by September 1st 2015). "Lessor shall deposit security deposit in a separate special bank account maintained by Lessor and Lessee. Lessor agrees that it will not commingle said security deposit with any of Lessors's other funds or property, but will hold such security deposit separate and apart Any withdrawals of funds from this account shall be made only upon written mutual consent of the parties for payment of obligations pursuant to the Lease Agreement. Upon termination of this Lease Agreement, any unused funds on deposit in the special account shall be returned to Lessee. Lessee herby grants approval to Lessor to use the security deposit for Aircrew training for crews required to perform this Agreement, deposit for Aircrafts to Aircraft Owner, and 121 certification costs.

h. Payment Schedule: As per Attachment C

\* \* \*

1. PRICE AND PAYMENTS. A.

  1.1. PASS Charters will pay to ViaAir the Price set forth above, as may be amended by agreement of the parties from time to time, for each Block Hour operated by ViaAir under this Agreement in addition to the monthly fixed cost payment. ; any decrease or increase in the amount of rate per hours shall be negotiated in good faith by the parties without delay upon ViaAir request. ViaAir shall substantiate the reason for the increase/decrease by providing evidence to PASS Charters. Flights hours for each flight shall be rounded to the nearest one-tenth of an hour. The price paid shall be the greater of (i) the actual Block Hours flown during any given period, or (ii) . All amounts paid by PASS Charters shall be in U.S. Dollars in immediately available funds. The Block Hour price is based on ViaAir's provision of ACMI (Aircraft, Crew, Maintenance and Insurance) only, subject to the terms and conditions of this Agreement. ViaAir shall be responsible for the ownership and/or lease costs of aircraft operated under this Agreement, provision of crews as necessary to operate all flights under this Agreement, all maintenance of ViaAir-operated aircraft, and all insurance covering ViaAir-operated aircraft. PASS Charters are responsible for the items listed on Attachment A; Any additional items for the responsibility of PASS to be agreed to and added to Attachment

  1.2. Based on the schedule supplied by PASS Charters pursuant to Article 3 of this Agreement, ViaAir shall reconcile and prepare a monthly invoice and submit it to PASS Charters within five (5) business days of the end of the month. The invoice shall also include any actual costs paid by ViaAir but which are ultimately to be borne by PASS Charters pursuant to this Agreement. PASS Charters shall pay each invoice in accordance with Attachment C.

2. CONTRACTUAL RELATIONSHIPS & SERVICES; OPERATIONAL CONTROL.

  2.1. PASS Charters represents that each passenger presented to ViaAir for carriage under this Agreement will be eligible to participate in the flight under applicable government rules and regulations, including but not limited to health, passport, visa, and other international travel requirements if required. ViaAir shall have no obligation to carry passengers who do not comply with applicable laws, rules and regulations. PASS Charters shall use its best efforts to ensure compliance by passengers with all customs, police, public health, and other regulations, including the immigration and customs laws, of each country or state from, through, or to which a flight is operated pursuant to this Agreement. ViaAir shall not be liable for loss or expense due to a passenger's

or PASS Charters's failure to comply with the requirements set forth above. PASS Charters shall indemnify and hold ViaAir harmless from any liability, loss, cost, or expense arising from PASS Charters's or any passenger's failure to meet its, his or her obligations under this section 2.1, including but not limited to any fines or penalties imposed upon ViaAir by customs, immigration or other authorities.

2.2. This Agreement is solely between ViaAir and PASS Charters and no other individual or organization shall be deemed a party hereto or to have any rights, obligations, or benefits under this Agreement.

2.3. ViaAir shall be entitled in cases of necessity to substitute equivalent aircraft for the aircraft specified by this Agreement and is authorized in such circumstances, to the extent permitted by applicable regulations, to sub-contract the performance of the obligations, with prior notification to PASS, it has undertaken hereunder to a duly authorized air carrier. Neither party may assign this Agreement, in whole or in part, without the prior written consent of the other party

2.4. ViaAir shall have exclusive operational control in the manner prescribed by FAR Part 135 and 121, including but not limited to Subpart T thereof and FARs 121.533, 121.535 and 121.537, as applicable, over each aircraft and each flight operated under this Agreement. ViaAir shall assign crewmembers (who shall be direct employees of ViaAir) for each flight and select the particular route to be flown and the airport(s) to be used. ViaAir shall determine the actual departure time of each flight (taking account of PASS Charters's requirements), and ViaAir shall determine the suitability of passengers and their possessions for carriage on the aircraft; provided, ViaAir shall use best efforts to operate at the intended times set forth in Attachment B, as may be amended by agreement of the parties from time to time. In addition, in respect of all flights operated under this Agreement, ViaAir shall have control and authority, to the exclusion of PASS Charters and all others, over crewmembers and their training; aircraft weight and balance; performance of aircraft maintenance; determination of aircraft airworthiness; flight dispatch, locating and tracking; and all other functions relating to the maintenance or operation of any ViaAir aircraft.

2.5. The pilot-in-command of each flight operated under this Agreement is authorized to take all necessary measures he or she deems necessary to ensure safety and security. The pilot-in-command shall have complete discretion to determine all matters relating to passengers, loading, load and distribution, whether and in what manner any flight shall be carried out, whether there shall be deviation from the specified route, and where landings shall be made. Such determination by the pilot-in-command shall be final and binding upon PASS Charters and all passengers.

2.6. ViaAir will not accept airfare payments from individual passengers and has not authorized receipt or acceptance of such individual payments by any other person on ViaAir's behalf.

2.7. In the event that any seats or space available to PASS Charters shall not be utilized by PASS Charters, PASS Charters hereby consents to the use by ViaAir of such seats or space, without refund or reduction of the Price, for the transportation of persons and property for the purpose of supporting ViaAir's operations under this Agreement, subject to approval of PASS customer..

2.8. Subject to the best-efforts obligation set forth in section 2.4 above, the times of departure or arrival which may be designated in this Agreement or elsewhere are approximate and form no part of this contract nor shall they represent any undertaking of ViaAir to depart or arrive at such times. ViaAir assumes no responsibility for notifying passengers with respect to any agreed departure time, arrival time, delay or cancellation; all such notices shall be furnished to passengers by PASS Charters, provided that on-board announcements or advisories required by government regulation shall be the responsibility of ViaAir.

3. SCHEDULES.

3.1. PASS Charters shall notify ViaAir as far in advance as possible of the proposed schedule for each day's operations to be conducted by

ViaAir under this Agreement. ViaAir and PASS shall establish a notification and booking process with communication procedures for all flights; ViaAir shall use its best efforts to accommodate the requested schedule, as well as any changes in the schedule subsequently requested by PASS Charters, to the extent feasible under applicable government rules and regulations; provided, such changes may result in additional charges to PASS Charters to reimburse ViaAir for any increase in its ACMI costs resulting from the change.

4. GOVERNMENT LAWS, REGULATIONS AND APPROVALS.

  4.1. All flights shall be operated under PASS Charters's conditions of carriage applicable to passengers; PASS Charters shall contract directly with all passengers to be carried. Neither PASS Charters nor ViaAir shall have authority to bind the other contractually to passengers or otherwise. PASS Charters shall issue to passengers such itineraries, baggage checks, and other traffic documents as are necessary or appropriate. PASS Charters shall ensure that passengers comply with the laws, rules and regulations governing their carriage: provided ViaAir shall be responsible for the safety of each flight including but not limited to the provision of pre-flight safety briefings to passengers, and compliance with all FAA operational requirements.

  4.2. Each party agrees to comply with all DOT, FAA, Transportation Security Administration (TSA) and other statutes, rules, regulations, orders, decisions, notices, requirements, guidelines and policies as may be applicable to it. In particular, this Agreement is entered into in accordance with, and the parties shall comply with, the provisions of FAR 119.53, paragraphs (a) through (d), applicable to dry leasing of aircraft and other rules and regulations governing dry-lease operations. ViaAir to insure a Argus registration

  4.3. ViaAir's obligation to dry-lease aircraft to PASS Charters and operate flights under this Agreement shall be contingent upon and subject to the timely issuance of such approvals, clearances, permits, and operating authorities as may be required to be issued or granted by the DOT, FAA, TSA, and any other governmental agency whether foreign or domestic. In the event that any governmental agency shall fail or refuse to issue or grant the approvals, clearances, permits, or operating authority referred to herein sufficiently in advance to enable ViaAir to make required flight arrangements or shall, after issuance, revoke or rescind the same, ViaAir may elect to terminate this Agreement in total or in respect to the affected flights without liability for penalties or damages. In the event ViaAir shall become insolvent and or file for bankruptcy protection, PASS Charter shall have the right to assume ViaAir lease agreement on the aircraft and take over operations as required and subject to the master lease with head Lessor.

  4.4. In the event of a flight delay or cancellation, PASS Charters shall provide, at its sole cost and expense, any and all amenities, services, alternate transportation or refunds to passengers required under PASS Charters's conditions of carriage or as PASS Charters otherwise deems appropriate. Should the primary ViaAir aircraft have a mechanical delay which cannot be quickly resolved, ViaAir shall make best efforts to replace the primary aircraft with an internal backup aircraft. Should ViaAir not have an internal backup and the aircraft mechanical on the primary aircraft cannot be fixed within a reasonable timeframe, PASS Charters and ViaAir shall work together to resolve a replacement outside of the ViaAir fleet.

5. PASSENGERS.

  5.1. PASS Charters agrees at its own expense to give such notice to passengers as is appropriate upon the occurrence of any event which causes or may cause the delay or cancellation of any one or more flights. ViaAir shall incur no liability of any nature to PASS Charters or any passenger or other party as a result of the giving of such notice or the failure to do so. ViaAir has the responsibility to immediately communicate aircraft delays.

  PASS Charters and ViaAir shall each comply with the Air Carrier Access Act and all regulations issued by DOT with respect to Nondiscrimination on the Basis of Disability in Air Travel, 14 CFR Part 382, in respect of all flights to or from the United States operated

under this Agreement. To the extent permitted by Part 382, PASS Charters shall notify ViaAir of any passengers with disabilities at least forty-eight (48) hours (or as soon thereafter as possible) in advance of travel, so as to provide ViaAir advance notice of the passenger's intention to travel and of the passenger's disability and special needs. ViaAir shall ascertain if the necessary services and accommodations are available for the flight and provide such services and accommodations to the passenger, if available.

5.2. Except as otherwise required by applicable law or regulation, ViaAir may refuse carriage to, or off-load, any person whose condition, conduct or behavior may, in the opinion of ViaAir or its pilot-in-command, be such as to involve a safety or security hazard or risk to the passenger, other persons, the aircraft, or other property. In the event that ViaAir refuses carriage or off-loads any passenger, a written report of the incident shall be provided to PASS Charters without delay describing the incident and the reasons for ViaAir's action.

6. PASSENGERS' BAGGAGE AND PROPERTY.

    6.1. PASS Charters will accept for carriage with each passenger only such personal property as is necessary for the purpose of the trip, which will not compromise the safety or security of the flight, and which can be transported in accordance with applicable laws, rules, regulations and procedures. With the exception of checked baggage, all such property shall remain in the respective passenger's possession at all times, and ViaAir shall have no liability or responsibility for such property. ViaAir may refuse to carry any property if its weight, size, or character renders it unsuitable for carriage. Under no circumstances shall PASS Charters permit on board or accept for transportation on any ViaAir-operated flight any hazardous materials (HAZMAT) or dangerous goods (DG), and PASS Charters shall provide timely and sufficient written notice of this restriction to all passengers.

    6.2. All baggage including cabin baggage is limited to the maximum weight restrictions of the aircraft and operational limitations of the aircraft and operations of ViaAir. PASS Charters agrees to include this statement in the contract of carriage and any other notice between itself and passengers in conformity with the Montreal Convention or the Warsaw Convention, as applicable. ViaAir may refuse to carry a passenger's baggage or property on any flight other than the one on which the passenger is transported. Except as required by Part 382 of the DOT regulations, ViaAir may refuse any property for transportation if it cannot accept ordinary handling or if its weight, size, or character renders it unsuitable for transportation.

    6.3. Fragile or perishable items unsuitable as checked baggage, such as but not limited to musical instruments (guitars, drums), electronic items (phonographs, TVs), ornamental items (wigs, antiques, clocks), artistic items (paintings, sculptures), photographic items (more than one camera, lenses), sporting/recreational items (skis, bicycles), paper items (decorations, manuscripts), perishable items (fruits, candy, plants, chemicals, film, medicines) and items made of or bottled in glass (perfumes, liquors), must be adequately packaged and protected.

    6.4. PASS Charters will not accept any live animals for transportation except as required by Part 382 of the DOT regulations.

    6.5. PASS Charters will refuse to accept for transportation any baggage that does not bear a tag, label or other device with the passenger's full name and address.

    6.6. Notwithstanding any other provision of this Agreement, ViaAir shall not be liable for, and PASS Charters shall indemnify and hold ViaAir harmless from, any loss, damage or expense arising out of or relating to delay, damage, loss or non-delivery of any passenger's baggage or other property. All claims for loss, damage or expense arising out of or relating to delay, damage, loss or non-delivery of a passenger's baggage or other property shall be submitted directly to PASS Charters or referred by ViaAir to PASS Charters, as the case may be, and shall be processed and discharged promptly by PASS Charters including the payment of any sum determined to be due the passenger in response to the claim, and the assumption by PASS Charters of all actual and potential

liability relating to the claim. In processing and responding to claims, PASS Charters shall apply to the maximum extent available the limitations of liability for delay, damage, loss or non-delivery of a passenger's baggage or other property established under the Montreal Convention or the Warsaw Convention, as applicable.

6.7. PASS Charters warrants that it shall cause all notices required under this Agreement and the Montreal Convention or the Warsaw Convention, as applicable, including the notice entitled Advice to International Passengers of Limitations of Liability, to be timely delivered in writing, in a manner designed to ensure enforceability of all restrictions and limitations applicable to passengers, to each passenger to be transported on an ViaAir-operated flight.

7. **LIABILITY AND FORCE MAJEURE.**

    7.1. Any flight may be delayed or canceled by ViaAir due to weather conditions, fuel shortages, strikes or labor problems, acts of God, absence of any necessary governmental approvals, other governmental action, wars or civil commotions, sanctions, seizure under legal process, airport closure, or any other cause beyond ViaAir's control (whether of the same or different nature); as such, the operation of any flight is not guaranteed. The limited right of cancellation reserved to ViaAir under this section 7.1 shall be in addition to, and not in place of or in derogation of, any other rights which ViaAir may have, at law or in equity or under any other provision of this Agreement.

    7.2. ViaAir will utilize its best efforts to cooperate with and assist PASS Charters in the event substitute service or other changes are required.

    7.3. ViaAir agrees upon request to carry equipment, documents or other property of PASS Charters, space and weight restrictions permitting, on any flights to be flown hereunder. ViaAir shall have no liability for damage or loss of such equipment, documents or other property.

8. **INSURANCE AND INDEMNITY.**

    8.1. ViaAir will at all times while any aircraft is in use under this Agreement maintain insurance coverage applicable to such aircraft in the amounts and containing the provisions set forth below:

    8.1.1. All-risk ground, taxiing, and flight hull insurance, including foreign object damage with a deductible no greater than USD 150,000.00, with respect to the aircraft, which policy will contain a waiver of subrogation endorsement in favor of PASS Charters.

    8.1.2. Comprehensive air carrier liability insurance including contractual liability, public liability, passenger legal liability, premises damage liability, cargo and personal property liability, personal injury and property damage, with limits of at least one hundred fifty million dollars (USD 150,000,000.00) combined single limit per occurrence. All public liability and passenger legal liability insurance will insure against liability which ViaAir or PASS Charters or both might incur by reason of ViaAir's operation of the aircraft.

    8.1.3. All such insurance policies shall name as additional insureds PASS Charters and its officers and directors and such additional entities as either party may reasonably designate; ViaAir shall list all of PASS clients as additional insure.

    8.1.4. ViaAir shall arrange with its insurer or insurance broker that in the event of cancellation of ViaAir's insurance for any reason whatsoever or in the event of any material change, restriction, or reduction in coverage afforded by such policies, written notice of such change, restriction, reduction in coverage or cancellation shall be sent to PASS Charters not less than thirty (30) days (or such lesser period as may be customarily available in respect of War and Allied Perils) prior to the date such change, restriction, reduction in coverage or cancellation will be effective.

    8.2. To the extent not covered by insurance carried by ViaAir or PASS Charters, PASS Charters shall indemnify ViaAir against any third party claims, demands or causes of action whenever

occurring which arise out of the actions or failures to act of PASS Charters in accordance with this Agreement.

8.3. To the extent not covered by insurance carried by ViaAir or PASS Charters, ViaAir shall indemnify PASS Charters against any third party claims, demands, or causes of action whenever occurring which arise out of the actions or failures to act of ViaAir in accordance with this Agreement.

8.4. PASS Charters shall ensure that all ground handlers, fuelers and other service providers arranged for by PASS Charters are satisfactory to ViaAir in its reasonable discretion and carry such insurance in such amounts and with such provisions in favor of ViaAir as may reasonably be required by ViaAir. PASS Charters shall indemnify ViaAir against any claim, lien, or other action asserted against ViaAir or its aircraft by any ground handler, fueler or other service provider except if any damage was caused by an employee of ViaAir.

8.5. The respective party required to make certain under this Agreement that insurance is provided will cause certificates of insurance to be furnished to the other party prior to the start of operations hereunder, evidencing that all of the insurance required under this Agreement is in full force and effect with insurers of nationally recognized standing and reputation in the United States.

9. REPORTS AND NOTICES.

9.1. PASS Charters will furnish to ViaAir at such time and in such form as requested, all such data as is reasonably requested by ViaAir to facilitate compliance with applicable laws, rules, regulations and procedures.

9.2. ViaAir will furnish to PASS Charters at such time and in such form as requested, all such data as is reasonably requested by PASS Charters to facilitate compliance with applicable laws, rules, regulations and procedures.

10. DISCLOSURES AND CONSUMER PROTECTION.

10.1. In advertising, marketing and selling seats on flights to be operated under this Agreement, PASS Charters shall ensure all appropriate disclosure that ViaAir will operate the flights is made on PASS Charter's Web site and elsewhere to the extent and in the manner required by DOT regulations, 14 CFR Part 257, and shall indemnify and hold ViaAir harmless against the results of any noncompliance.

10.2. PASS Charters shall comply with all other DOT requirements applicable to it, including but not limited to 14 CFR Part 243 (passenger manifest information), 14 CFR Part 250 (denied boarding procedures and compensation), and 14 CFR Part 259 (tarmac delay plan, customer service plan, and other passenger protections), and shall indemnify and hold ViaAir harmless against the results of any noncompliance.

11. Performance Review Meetings.

11.1. The parties shall perform a monthly Performance Review Meeting ("PRM") in which the performance of ViaAir, the communication between the parties as well as operating procedures will be reviewed.

11.2. Each PRM will be summarized with actionable Action Items that will be monitored and reviewed on the following PRM.

11.3. Each Party will identify 2 members of its executive staff to participate in the PRM.

12. MISCELLANEOUS.

12.1. This Agreement:

12.1.1. This document reflects only this agreement between PASS and ViaAir (dry lease agreement);

12.1.2. shall not bind either party until signed by an authorized official of such party, nor be modified except by written agreement signed by authorized officials of both parties;

12.1.3. shall be interpreted in accordance with the laws of the State of Michigan, USA; and

12.1.4. shall be terminable by either party forthwith in the event the other shall seek the protection or be placed under the jurisdiction of any bankruptcy court, shall be or become insolvent, or shall make a general assignment for the benefit of creditors.

12.2. The failure of either party at any time to require the performance by the other of any of the terms or provisions hereof shall in no way affect the right of that party thereafter to enforce the same; nor shall the waiver by either party of any breach of a term or provision hereof be taken or held to be a waiver of a succeeding breach of such term or provision, or as a waiver of the term or the provision itself.

12.3. Titles are inserted in this Agreement for the purposes of reference and convenience and in no way define, limit or describe the scope or intent of this Agreement. As used in this Agreement, the masculine, feminine, or neutral gender, and the singular and plural number shall each be deemed to include the others whenever the context so indicates.

12.4. All notices and other communications between the parties provided for or permitted hereunder shall be made in writing and delivered by facsimile or other electronic means to the respective official signing this Agreement at the following address:

If to PASS Charters, to: PASS Charters

Attention - William Larkin

6544 Highland Road

Suite 101

Waterford, MI 48327

Phone - (248) 644-1952

Fax - (248) 644-3316

Email - blarkin@passcharters.com

If to ViaAir, to:

Via Airlines Attention – Ami Vizer, Chairman

218 Jackson St.

Maitland, FL 32751

Phone - (407) 641-4122

Fax - (407) 641-4122

Email – ami@flyviaair.com

All notices shall be effective upon receipt.

12.5. This Agreement may be executed in counterparts, each of which shall be deemed an original, but which together shall constitute one and the same instrument. Receipt of a facsimile or other electronic

12.6. Each individual who executes this Agreement on behalf of a party certifies that he or she is duly authorized to execute this Agreement on behalf of that party and is acting within the scope of his or her authority in doing so.

IN WITNESS WHEREOF, PASS Charters and ViaAir have caused this Agreement to be duly executed as of the date and year first written above.

PASS Charters

Signature: /s/ William Larkin
Printed Name: William B Larkin
Title: President

Via Airlines

Signature: /s/ Amos Vizer
Printed Name: Amos Vizer
Title: Chairman

-8-

ATTACHMENT A

Costs Borne by PASS Charters

1. Passenger taxes and fees
2. Third-party charges whether assessed on a per-passenger basis or otherwise including but not limited to security screening
3. Landing and airport fees including space rental for ViaAir to comply with operational requirements
4. Gate rental, check-in and loading/unloading charges
5. Ground handling, including but not limited to aircraft parking, ramp handling charges, passenger handling charges, bus transfers, aircraft cleaning
6. De-icing as necessary
7. Overflight and air traffic control charges, if any
8. Fuel, oil and all other fluids consumed by aircraft for all flights regardless of purpose from the start of this agreement.
9. Crew layover expenses, including lodging at locations away from the base of operations as necessary
10. Crew base costs including but not limited to housing, per diem, rental car, transfers and airline tickets to swap flight crews on average every six (6) days.
11. Inflight catering and supply costs and all costs of any pre- or post-flight amenities provided to passengers; revenues from any inflight sale of food, beverages, or other items supplied by PASS Charters shall be disbursed to PASS Charters, which shall set the retail price of each item
12. Secure flight data processing and reservations system integration if applicable
13. All marketing, advertising, promotion and sales expenses

-9-

ATTACHMENT B PROPOSED SCHEDULE

ON DEMAND SCHEDULED FLIGHTS

## ATTACHMENT C - PAYMENT SCHEDULE

PASS Charters shall make the fixed rent payment no later than the 28th day of the preceding month. Pass Charters shall remit payment for Variable Hours Payment no later than ten (10) days of receipt of Invoice.

ViaAir shall accomplish reconciliation of actual Flight Hours operated during each calendar month, and any other charges incurred by ViaAir that are PASS Charters's responsibility, during the first ten (10) days of the ensuing calendar month. Invoice shall be issued upon completion of each reconciliation with payment due ten (10) days after date of Invoice.

**Block Hours Variable Payment shall be as follows:**

|  | ERJ-140 | EMB-120 |
|---|---|---|
| First 450 Block Hours: | $1,379.00 | $886.00 |
| 451 - 600 Block Hours: | $1879.00 | $1186.00 |
| 600 + Block Hours: | $2379.00 | $1486.00 |

**Additional Payments Due**

**STM Surcharge**

In addition to all payments detailed in this agreement, Pass Charters shall pay ViaAir an additional $200 per Block flight hour ("STM surcharge") for flights provided to Shorts Travel.

The Parties will reconcile these amounts, in good faith as part of the monthly reconciliation. All STM surcharge payments shall be paid in accordance with the payment terms detailed in this Agreement.

**Additional non-dedicated Airplanes ACMI**

Based on availability and provided that Pass Charters utilizes all airplanes detailed in Attachment D, Pass Charters shall be entitled to use additional airplanes on ViaAir's fleet with an ACMI payment per Block hour of:

1. ERJ-145/140/135 - $3,785 per Block hour
2. EMB-120 - $2,250 per Block Hour

All payments to ViaAir shall be accomplished by electronic transfer of U.S. Dollars to the following account:

| Bank: | Bank of America |
|---|---|
|  | Orlando, FL |
| Wire Deposit ABA#: | 026009593 |
| ACH Deposit ABA#: | 063100277 |
| ACCT#: | 898052316815 |
| ACCT Name: | Via Airlines |

-11-

## Attachment D – Aircrafts

The following section details the Aircraft Pass commits to charter from ViaAir

| Aircraft Type | N-Number | Into service date | Period of Operation | Monthly Fixed |
|---|---|---|---|---|
| ERJ140 | TBD | September 1st, 2015 | Annual | $126,291 |
| ERJ140 | TBD | October 19th, 2015 | Annual | $126,291 |
| ERJ140 | TBD | October 19th, 2015 | Annual | $126,291 |
| ERJ140 | TBD | November 1st 2015 | Annual | $126,291 |
| EMB120 | TBD | October 1st 2015 | Each year between October – March 1st * | $85,416 |

\* End of Period of operation is defined as the end of March Madness.